(May 15, 2007)

■ IDELFONSO RIVERA, SR., et al., Appellants-Respondents,[1] v CITY OF NEW YORK et al., Respondents-Appellants. [836 NYS2d 108]—

Order, Supreme Court, Bronx County (Stanley Green, J.), entered December 2, 2004, which, to the extent appealed from, granted defendants' motion to set aside a jury verdict to the extent of directing a new trial on compensatory damages unless plaintiffs stipulated to reduce the verdict from $30 million to $250,000 for Idelfonso Rivera, Sr., from $3 million to $100,000 for Idelfonso Rivera, Jr., from $15 million to $75,000 for Lorenzo Rivera, from $5 million to $50,000 for Martin Torres, from $15 million to $75,000 for Rafael Marrero, from $3 million to $25,000 for David Andino, and from $10 million to $50,000 for Calvin Gonzalez, and dismissed all claims for post-traumatic stress or anxiety disorder, while not disturbing the $10,000 award to Carmen Rivera for loss of consortium, reversed, on the law, without costs, and defendants' motion granted unconditionally. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.

On Labor Day 1992, seven plaintiffs and several other

---

1. Throughout the record and briefs, the first names of the first two plaintiffs are occasionally spelled "Ildefonso," and the first name of the eighth plaintiff is occasionally spelled "Kelvin."

members of Positive Workforce, Inc.[2] participated in a demonstration at Orchard Beach in the Bronx to protest what they believed were discriminatory practices by Anheuser-Busch against independent beer distributors. Thousands of others attended a concert on the beach that afternoon. It is uncontroverted that during the early afternoon, the protestors marched, chanted, held up placards and handed out fliers. Although the protestors did not have the required park permit to demonstrate, the police did not interfere with their demonstration because, up until the time the concert was about to end, the demonstration was organized and peaceful.

However, at about 5 o'clock, the police became concerned because the majority of concertgoers would exit by way of the boardwalk where some of the protestors were still handing out fliers. Although the performance was not scheduled to end until 5:30 P.M., people were starting to leave the concert area earlier. The protestors admittedly refused to comply with police directives to stop handing out fliers and to leave. Some members of a gathering crowd started chanting "racism," and some plaintiffs admitted they joined in. A large crowd gathered, people began throwing bottles and rocks, and a brief scuffle ensued between police and protesting plaintiffs. The police arrested four plaintiffs and issued summonses to another three.

The original complaint charged plaintiffs Idelfonso Rivera, Sr., Idelfonso Rivera, Jr., Lorenzo Rivera and Marrero with assault in the second degree, rioting, resisting arrest, inciting to riot, disorderly conduct (Penal Law § 240.20 [1]) and harassment.[3] The court released all four arrested plaintiffs from custody after their arraignment. These four were acquitted after trial three years later. The record does not explain the three-year delay. Plaintiff Torres was released after he received a summons for disorderly conduct, and five months later the court dismissed the case against him. Plaintiff Gonzalez was issued two summonses: one for disobeying a sign and passing out fliers, and another for disorderly conduct (acting in a loud and abusive manner and also apparently being intoxicated). He was released, and the court dismissed the charges against him four months later. Plaintiff Andino received a summons and was released. However, Andino's summons was never filed with the

2. Positive Workforce, Inc. is a nonprofit organization which helps finds jobs for minority workers within the New York metropolitan area, primarily in the construction industry.

3. The superseding complaint charged that they acted in concert and committed acts of harassment, assault, resisting arrest and two counts of disorderly conduct (Penal Law § 240.20 [1], [6]).

court, and consequently, the authorities made no further effort to prosecute him.

After the criminal charges were resolved in the seven's favor, they and Carmen Rivera, the wife of Rivera, Sr., commenced this civil action for damages, alleging excessive police force, malicious prosecution, false arrest, and, with respect to Carmen, loss of consortium. In addition to witness testimony, three videos of the incident were introduced into evidence and repeatedly shown to the jury.

The jury found defendant City of New York had no probable cause to arrest any of the demonstrating plaintiffs, that all demonstrating plaintiffs except Rivera, Jr. had been falsely arrested, that all demonstrating plaintiffs except Torres and Andino had been maliciously prosecuted, and that the police had used excessive force against all demonstrating plaintiffs except Lorenzo Rivera and Andino. The jury was instructed to calculate compensatory damages and, without fixing an amount, to determine only whether plaintiffs would be entitled to punitive damages.

The jury returned a verdict for plaintiffs in the amount of $81,010,000 for present pain and suffering, but gave plaintiffs no such future damages. Because the award was excessive beyond the bounds of rational explanation, the court declared that the jury had mistakenly considered punitive damages based either on a lack of clarity in the charge or because plaintiffs' counsel in summation had urged the jury to send a message that would be heard at One Police Plaza by awarding "as many millions of dollars as you can justify." Accordingly, the court questioned the jury further, asking whether the amount it awarded was meant to include punitive damages as well as compensatory damages. The jurors responded "yes," and the court directed them to deliberate further and to award only compensatory damages. The jury responded with this note: "We the jury feel that the pain and suffering today awarded to each plaintiff was first awarded for just that, pain and suffering to date. And was not punitive. Therefore, we the jury have no changes."

Based on what the trial court termed the "outrageously excessive verdict" and "inconsistent answers," it found the jury not competent to determine the further issue of punitive damages and discharged it. Defendants moved to set the verdict aside, and the court granted the application to the extent of drastically reducing the verdict by $80,375,000, to $635,000.

On appeal, defendants again argue that the verdict should be set aside. Plaintiffs cross-appeal from that part of the court's

order that reduced the amount of damages, dismissed the claims for post-traumatic stress disorder and anxiety disorder, and denied compensation for the three-year interval between arraignment and trial of four plaintiffs.

We begin our analysis by noting that more than once during oral argument, the attorneys for both sides assured this Court that the video recordings introduced into evidence accurately and fully depicted all the pertinent events on the boardwalk leading to the demonstrating plaintiffs' arrests and detentions.[4] The video recordings do not depict any relevant events after the parties left the boardwalk. This visual aid places us in the unique position of being able to assess most of the critical evidence with heightened insight and thus with the functional equivalent of firsthand knowledge of the conduct of the individual defendant police officers and plaintiffs.

To state a claim for malicious prosecution,[5] a plaintiff must prove (1) the initiation or continuation of legal action against him, (2) termination of the proceeding in his favor, (3) absence of probable cause to commence the proceeding, and (4) actual malice (*see Broughton v State of New York*, 37 NY2d 451, 457 [1975], *cert denied sub nom. Schanbarger v Kellogg*, 423 US 929 [1975]). Therefore, once probable cause has been established, a cause of action to recover for malicious prosecution may not be successfully maintained (*see Batista v City of New York*, 15 AD3d 304, 305 [2005]).

In order to conclude, as a matter of law, that the jury verdict was not supported by sufficient evidence—thus requiring dismissal—there must be "simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]). "Probable cause consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty" (*Colon v City of New York*, 60 NY2d 78, 82 [1983]). Proof beyond a reasonable doubt is not required.

Discounting, as we therefore must, the police testimony that some demonstrators approached and harassed people on the boardwalk who were drinking Budweiser and took away their

---

**4.** While, of course, not dispositive, it appears, in a colloquy just before the trial began, that plaintiffs' counsel also seems to have conceded that the videos "would be deemed admissible as the tapes of the events as they took place."

**5.** The jury found that Torres and Andino had not been maliciously prosecuted.

beer (although videos of the scene show some plaintiffs conversing with passersby), the record unequivocally shows that the police first approached plaintiffs in a friendly manner at a time when the boardwalk was crowded and requested that they stop handing out fliers and leave. The protestors admitted they refused to leave and some admitted they continued to hand out fliers. In fact, they testified emphatically that they had a right to remain on the boardwalk. Others admittedly joined in the gathering crowd's chant of racism. While the protesting plaintiffs denied throwing rocks and bottles, the record unquestionably establishes that during the incident rocks and bottles were thrown at the police. These facts inexorably lead to the inescapable conclusion that regardless of the protesting plaintiffs' belief in their right to remain, the police officers had a reasonable belief that these plaintiffs, also based on their own admissions at trial, were acting in a disorderly manner (see Penal Law § 240.20).[6] Although not dispositive, we further note that the protesting plaintiffs did not have a permit for their demonstration, and the police would have been completely justified had they initiated charges for that legal violation. In any event, upon a review of this record, including the video, it is impossible to hold that there was any valid line of reasoning or permissible inferences that could have led this or any jury to conclude rationally that these defendants were liable for malicious prosecution based on lack of probable cause. To the contrary, the evidence of probable cause in this record is strong and free of ambiguity.

Plaintiffs maintain that even if the police possessed probable cause to arrest, they subsequently learned that handing out fliers was not prohibited by law, and, thus, the continued prosecution of these protestors was malicious. However, no plaintiff was charged solely with handing out fliers. In fact, only one plaintiff, Gonzalez, was charged with handing out fliers, but he was also issued a summons for disorderly conduct. Indeed, every protesting plaintiff was accused of disorderly conduct, and most were charged with additional related offenses.

---

**6.** This court charged the jury with these subdivisions of Penal Law § 240.20:

"A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:

"1. He engages in fighting or in violent, tumultuous or threatening behavior; or . . .

"5. He obstructs vehicular or pedestrian traffic; or

"6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or

"7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose."

The record reflects that defendants subsequently became aware in January 1993—at the prosecution of the only plaintiff so charged—that handing out fliers did not violate park regulations. However, the record is devoid of any suggestion that, between the moment the protesting plaintiffs were detained or arrested and the time of their respective prosecutions, defendants became aware of any intervening exculpatory fact, or any fact, casting doubt on the existence of probable cause to charge any plaintiff with *disorderly conduct*.

Moreover, as for plaintiff Gonzalez, the record contains no evidence that defendant Jeszeck—the only police officer found by the jury to have maliciously prosecuted Gonzalez—became aware, between the time Gonzalez received a summons and was released and the dismissal four months later, that handing out fliers did not violate park rules (*see Brown v City of New York*, 92 AD2d 15 [1983], *affd* 60 NY2d 893 [1983]; *Oakley v City of Rochester*, 71 AD2d 15 [1979], *affd* 51 NY2d 908 [1980]). In any event, Gonzalez was also charged with disorderly conduct. Consequently, despite plaintiffs' contention, the malicious prosecution claim must be dismissed (*see Callan v State of New York*, 73 NY2d 731 [1988], *revg for reasons stated in dissenting op* 134 AD2d 882, 883-884 [1987]).

Beyond our finding of probable cause for the disorderly conduct charges leveled against all the protesting plaintiffs, which itself requires us to dismiss the malicious prosecution claim, we nonetheless note that this record is devoid of any evidence of actual malice on defendants' part in prosecuting plaintiffs for their involvement in this incident. Rather, the record reflects that the police engaged in reasonable efforts to induce the protesting plaintiffs to clear the boardwalk, initially approaching them only at a time when the boardwalk became crowded and asking them to stop handing out fliers and leave. Plaintiffs admit they refused to leave, argued with the police, and some joined in chanting racism. The record also reflects that the police warned these plaintiffs they would be arrested if they persisted and did not leave. Yet they remained and in fact, as the video clearly depicts, resisted the police who only then tried to take them into custody. The video also shows that the police perceived the demonstrators' actions as at first refusing to cooperate, and then resisting police efforts to physically take them into custody.

Any rational person, objectively looking at the video and reviewing the other evidence, would find the police more than justified in their concern that this episode might escalate into violence. They thus appropriately tried to quell a quickly unfold-

ing, potentially explosive situation. We emphasize that this all occurred at a moment when thousands of innocent and unaware others were either exiting or about to exit the concert onto the boardwalk. There is no proof in the record—particularly on the video—from which a jury could conclude that defendants acted with malice. The absence of a factual foundation completely undermines plaintiffs' malicious prosecution claim (*see Khan v Duane Reade*, 7 AD3d 311 [2004]). Moreover, the trial court correctly denied plaintiffs' claim for additional damages for the three-year interval between arrest and trial, there being no evidence of the reasons for the delay or any identifiable damages sustained as a result.

In any event, and even assuming arguendo that certain defendants were liable for malicious prosecution, the award for compensatory damages, even as reduced by the trial court to $635,000, was excessive. A determination of whether a damage award is excessive depends on whether that award deviates materially from what would be reasonable compensation (*see* CPLR 5501 [c]; *Donlon v City of New York*, 284 AD2d 13 [2001]). The four plaintiffs who were arrested were not imprisoned during the time between arraignment and trial. There was no objective evidence produced at trial to establish any damages sustained or additional expenses incurred as a result of their criminal prosecution or the prosecution of Gonzalez. In short, there were no objective facts, other than inconvenience (for which the law does not compensate), from which the jury or the court could quantify any compensatory damages, beyond the nominal, for the alleged malicious prosecution in this case[7] (*see Rohrs v Rohrs*, 17 AD3d 659 [2005] [$25,000 reasonable compensation for malicious prosecution claim]; *Lynch v County of Nassau*, 278 AD2d 205 [2000] [$10,000 reasonable compensation in a suit for false arrest, malicious prosecution and intentional infliction of emotional distress where plaintiff suffered humiliation and deprivation of liberty as a result of being arrested, handcuffed, booked and fingerprinted, and by subsequent criminal proceeding, but little objective evidence that she suffered significant damage to reputation]; *Parkin v Cornell Univ.*, 182 AD2d 850 [1992], *lv dismissed* 80 NY2d 914 [1992] [$100,000 compensatory damage award reduced to $10,000 where plaintiff suffered almost no financial loss, no medical bills incurred, and contact with criminal justice system brief]; *see also Papa v City of New York*, 194 AD2d 527, 531 [1993], *lv*

---

7. The jury was instructed to calculate only one award for compensatory damages with respect to each plaintiff, assuming liability, for all three causes of action—malicious prosecution, false arrest and excessive force.

*dismissed* 82 NY2d 918 [1994] [$25,000 award for past injury to reputation vacated where no objective evidence of reputation before and after false arrest and malicious prosecution]; *compare Maxwell v City of New York*, 156 AD2d 28 [1990] [$175,000 reasonable compensation for malicious prosecution where plaintiff arrested at workplace, arrest reported to media, and plaintiff kept in jail more than three weeks]).

To prove a cause of action for false imprisonment, a plaintiff must demonstrate that the defendant intended to confine the plaintiff, the plaintiff was conscious of the confinement, the plaintiff did not consent to the confinement, and the confinement was not otherwise privileged (*see Martinez v City of Schenectady*, 97 NY2d 78 [2001]). Here, defendants had probable cause to arrest and to issue summonses. Lack of probable cause to arrest or prosecute is an essential element of false arrest.[8] Accordingly, the false arrest claim must be dismissed (*see Batista*, 15 AD3d at 305).

Assuming, arguendo, defendants did not have probable cause to arrest, the amount of damages, even as reduced by the court, was excessive. Damages for false arrest are limited to the period between arrest and arraignment (*see Gutierrez v City of New York*, 288 AD2d 86 [2001]). The only person who testified regarding the length of his confinement was Rivera, Sr. He said he was released the next day. The court charged the jury that all arrested plaintiffs had been released within 24 hours. With respect to the three plaintiffs who had been issued summonses, there was no testimony as to how much time they spent in the police station before being released. Even crediting their testimony that they were forced to sit on the floor of the police substation while being processed and that the officers hurled racial epithets at them, and agreeing that such treatment should never be condoned, the award was nonetheless excessive. There is no objective evidence to establish plaintiffs sustained any injuries between arrest and release (*see id.* [award of $500 upheld for false arrest for one day of confinement and no evidence of physical injuries]).

In order to determine whether a police officer used excessive force, the claim must be "analyzed under the Fourth Amendment and its standard of objective reasonableness" (*Ostrander v State of New York*, 289 AD2d 463, 464 [2001]). The reasonableness of an officer's use of force must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" (*Graham v Connor*, 490 US

8. The jury found that Rivera, Jr. was not falsely arrested.

386, 396 [1989]; *see also Koeiman v City of New York*, 36 AD3d 451 [2007]).

Considering "the severity of the crime at issue, whether the suspect[s] pose[d] an immediate threat to the safety of the officers or others, and whether [they were] actively resisting arrest or attempting to evade arrest" (*Graham*, 490 US at 396), we find that, upon viewing the evidence in the light most favorable to plaintiffs (*see Accardi v City of New York*, 121 AD2d 489 [1986]), it was insufficient as a matter of law for a jury to find that the police used excessive force.[9] The record shows that a sergeant hit Rivera, Sr. on the head with a flashlight and that the same sergeant hit Gonzalez. According to plaintiffs, he hit Gonzalez on the head with his flashlight, and, according to defendants, he grazed Gonzalez with the hand that was holding the flashlight. In addition to these established occurrences, Marrero claimed he was struck by a flashlight, and Torres claimed an officer poked him in the eye.

However, assuming these contacts all occurred as plaintiffs testified, they all occurred at a time of impending or potential chaos, when the protesting plaintiffs were refusing to cooperate with the police, a crowd was gathering and chanting, thousands were about to leave the nearby concert by means of the boardwalk, and people were starting to throw rocks and bottles. Indeed, plaintiffs "submitted no evidence—expert or otherwise—demonstrating that the force used by the officers, judged from the perspective of a reasonable officer on the scene, was excessive" (*Koeiman*, 36 AD3d at 453; *see also Davis v State of New York*, 203 AD2d 234 [1994]; *Stein v State of New York*, 53 AD2d 988 [1976]). Defendant officers quickly separated plaintiffs, arresting only those they reasonably believed were the resisting and obstructing protestors. They did so as quickly as possible, and only then using necessary and minimal force to quell an increasingly hostile, antagonistic and uncooperative crowd so as to ensure their own safety and the safety of many other passersby. The video leaves an attentive and reasonable viewer with no other conclusion to draw. As the United States Supreme Court aptly stated, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation" (*Graham*, 490 US at 396-397).

In any event, even were we to find excessive force, the jury's

---

9. The jury found that none of the defendants had used excessive force against Lorenzo Rivera and Andino.

award of $81,010,000 was completely beyond any rational limit. Even though the trial court reduced that figure to $635,000, we still find the award exorbitant. Except for the 18 stitches Idelfonso Rivera, Sr. received, no medical damages were proven in this case. Idelfonso Rivera, Jr. complained of pain to the head, right knee and left elbow. Although his emergency room record indicated small abrasions to the left elbow and swelling, there was no visible deformity or other injury. Moreover, the record is barren of evidence of any follow-up medical visits or any proof that these initially minimal physical consequences to plaintiff Rivera, Jr. were of any lasting significance. Gonzalez testified that he saw a doctor a day or two later, but did not remember his name and submitted no objective medical evidence to substantiate his claimed injury. Similarly, Marrero submitted no objective medical evidence to substantiate his claim of injury, and Torres never asked a doctor to look at his eye or face.

The jury awarded Idelfonso Rivera, Sr. $30 million, which the trial court reduced to $250,000. We find the jury award shocking, to say the least, and we further find the reduced amount excessive. This is especially so since Rivera, Sr. offered no objective medical proof about his injury, merely testifying that he had stitches in the front of his head and visited the doctor once to remove them. Although he claimed a scar, he candidly conceded, "you can't see it so close it goes to my head."

In granting defendants' posttrial motion to the extent of reducing the damage award, the trial court noted there was no sign of a scar. No photos of the wound or any medical testimony regarding the exact location of the injury, its size, shape, disfigurement or permanency, if any, was placed before the jury (*see Vogt v Paradise Alley*, 30 AD3d 1039 [2006] [$75,000 compensatory award for past pain and suffering not excessive where 25-year-old plaintiff struck in the face with a beer bottle, causing four lacerations in her forehead ranging from one to ten centimeters in length; also sustained abscessed tooth and had root canal and crown replacement as a result of incident; three years after accident had three facial scars, numbness and muscle damage in right eyebrow area]; *Seidner v Unger*, 245 AD2d 362 [1997] [$40,000 adequate compensation of plaintiff who was 18 at time of accident and sustained a two-inch scar on her right cheek]; *Artis v City of New York*, 183 AD2d 685 [1992] [$50,000 reasonable compensation for plaintiff who caught her nose and face on a sharp fence, given seven stitches for relatively minor but permanent scar]).

The court properly found that damages for the psychological

injuries allegedly suffered by plaintiffs were not warranted for lack of proof, other than the speculative testimony of a psychiatrist who saw six of the seven protesting plaintiffs approximately eight years after their arrests, solely for this litigation and never having treated them.

Since the claims asserted by plaintiff Idelfonso Rivera, Sr. cannot be sustained, the law does not allow his wife's derivative action for loss of services. Accordingly, we must dismiss Carmen Rivera's cause of action (see Belanoff v Grayson, 98 AD2d 353 [1984]). Moreover, even were we to assume a viable derivative claim, Mrs. Rivera's vague and conclusory testimony, simply that her husband would not touch her for "some months" after the incident and that she had to stop working for "a while," failed to establish even minimal damages for a loss of consortium claim (see Gutierrez, 288 AD2d 86 [2001]; Lolik v Big V Supermarkets, 210 AD2d 703, 706 [1994], revd on other grounds 86 NY2d 744 [1995]; Silverstein v Harmonie Club of City of N.Y., 173 AD2d 378, 379 [1991]).

Punitive damages, in contrast to compensatory damages, are awarded to punish a defendant for wanton and reckless or malicious acts and to protect society against similar acts (see Home Ins. Co. v American Home Prods. Corp., 75 NY2d 196, 200 [1990]). The claim for punitive damages is not a separate cause of action (see Rocanova v Equitable Life Assur. Socy. of U.S., 83 NY2d 603 [1994]; Goldstein v Winard, 173 AD2d 201 [1991]). Accordingly, punitive damages may not be awarded absent sustainable compensatory damages (see Kaiser v Van Houten, 12 AD3d 1012, 1015 [2004]). In any event, even assuming defendants' liability, no reasonable view of the evidence supports a finding that defendants were "motivated by actual malice or acted in reckless disregard of" plaintiffs' rights (Nardelli v Stamberg, 44 NY2d 500, 503 [1978]).

We need not reach defendants' remaining contentions in light of our determination. Concur—Friedman, J.P., Marlow, Sullivan and Nardelli, JJ.

Gonzalez, J., dissents and would affirm for the reasons stated by Green, J.