Kimasia WASHPON, Plaintiff,

v.

Court Officer Julia PARR, individually and officially; Court Officer Lancer (first name unknown), individually and officially; and Sgt. Green (first name unknown), individually and officially, Defendants.

No. 06 Civ. 2400(NRB).

United States District Court, S.D. New York.

June 4, 2008.

speech; and (6) denying her equal protection.

Defendants now move for summary judgment on four grounds: (1) the force used was *de minimis*; (2) the complaint fails to state a proper First Amendment claim; (3) defendants are entitled to qualified immunity; and (4) plaintiffs fail to allege any personal involvement of Officer Lancer.

For the reasons set forth below, defendants' motion is granted in part and denied in part.

## BACKGROUND[1]

### I. Washpon's Arrest at the Bronx County Criminal Court

On the afternoon of March 31, 2004, Kimasia Washpon traveled from her home in Queens to the Bronx County Criminal Court at 215 East 161 Street in order to retrieve copies of certain court documents for a job that she was applying for.

When members of the public enter the Bronx County Criminal Court, they are guided by a set of ropes down two flights of stairs and onto a line where they are required to pass through metal detectors, or "magnometers."

On the afternoon of March 31, Washpon entered the building, walked down the two flights of stairs, and approached the metal detectors. She gave her handbag to the uniformed court officer in charge of the conveyor belt, and approached another court officer, Officer Julia Parr, who was standing near the metal detector. Washpon informed Officer Parr that the metal detector would likely sound the alarm

Jon C. Dupee, Jr., Esq., Dupee & Monroe, P.C., Goshen, NY, for Plaintiff Kimasia Washpon.

Roberta Martin, Esq., Office of the Attorney General, State of New York, New York, NY, for Defendants Parr, Lancer and Green.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 alleging violations of her rights under the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and also seeking redress under Article I § 11 of the New York State Constitution. Plaintiff alleges that defendants, while working as security officers at a Bronx County courthouse, violated her rights by (1) improperly detaining her; (2) illegally searching her belongings; (3) maliciously prosecuting her for disorderly conduct; (4) using excessive force to detain her; (5) quelling her exercise of constitutionally protected

1. The following facts come from plaintiff's Amended Complaint, dated April 18, 2006 ("Compl."); plaintiff's deposition ("Washpon Dep."); plaintiff's Affidavit in Opposition to Summary Judgment ("Dupee Aff."); the Affidavit of Julia Parr ("Parr Decl."); the Affidavit of Sgt. George Green ("Green Decl."); and the Defendant's Statement Pursuant to Local Rule 56.1 ("Defendant's Rule 56.1 Statement"). When facts are disputed, all reasonable inferences have been drawn in favor of plaintiff.

("beep") if she walked through. Washpon believed she would beep because of the extensive jewelry she was wearing at that time,[2] and which, apparently, she never removes for any reason whatsoever.[3] Washpon meant to suggest that Officer Parr should use the hand scanner she was holding at the time. Officer Parr did not accept the suggestion, however, and directed Wasphon to walk though the metal detector.

When Washpon walked through the metal detector, the alarm did in fact "beep" and Officer Parr directed Washpon to walk back again. About this time, another uniformed court officer, Officer Olga Lancer, suggested that the beep may have been caused by the cellular telephone ear-piece in Washpon's ear. Washpon said that it was not the ear-piece, but placed the ear-piece on the conveyor belt, and walked back through a second time.

On her second attempt, Washpon beeped again. This time, after walking through, Wasphon stood with her arms out, parallel to the ground, inviting Officer Parr to use the hand-scanner. Once again, however, Officer Parr directed Washpon to walk back through. At some point, Officer Parr instructed Washpon to remove all items from her pockets.[4] After Washpon's third and then her fourth failed attempts to pass through the metal detector Washpon asked Officer Parr to use the hand-scanner, but the hand-scanner was never used.

Sergeant George Green, the court officer in charge of the metal detector, testified that at some point during Washpon's numerous attempts to pass through the metal detector, he told Washpon that she could either comply with instructions and remove all objects from her pockets, or else she had to leave the building.[5]

After a fifth failed attempt, Officer Parr again instructed Washpon to walk back through. However, Washpon indicated that she did not wish to go back through the metal detector a sixth time. Officer Parr then instructed her to leave the building.[6] Washpon turned to walk away, and asked Officer Parr if she could speak with her supervisor.[7] Officer Parr responded that once Washpon left the building, Parr would get a supervisor.[8]

The accounts of what happened next differ, although more in terms of tone than actual sequence. Washpon's version of events is as follows: she walked away from the metal detector, and then approached a court officer at a podium at the bottom of the stairs to ask whether she could obtain the documents she needed at a different courthouse in New York City. Officer Parr then approached her again, told her she could not ask any questions here, and asked her to leave the premises immediately. Washpon then walked up the first flight of stairs, and, at the landing between flights, paused to rearrange the contents of her handbag—including personal items and a fish sandwich—which had been

---

2. Washpon described the jewelry she was wearing that day as follows: "I had a whole bunch of chains on, I had rings and bracelets, I had about eight chains on six—three on each arm—bracelets and a three finger ring and small rings ... on this hand." Wasphon Dep. 27:5–10.

3. In her deposition, Washpon stated, "I never take off my jewelry ... I never take it off ... When I go anywhere, I eat, sleep, wash all my jewelry stays on ... because I'm not into taking off my jewelry." 43:22–44:16.

4. Parr Decl. ¶ 17. Both Officer Parr and Sergeant Green seem to have believed that Washpon had items in her pockets. Washpon denies this. Washpon Dep. 28:13–14.

5. Green Decl. ¶ 17.

6. Washpon Dep. 36:9–13.

7. Washpon Dep. 37:8–10.

8. Washpon Dep. 40:8–9.

pulled out when they were sent through the conveyor belt. At this point, according to Washpon, three court officers arrested her.[9]

Officer Parr's version is that once Washpon refused to comply with directions at the metal detectors, Sergeant Green ordered Parr and Officer Lancer to escort Washpon out of the building. While the two officers were escorting Washpon out of the building, Washpon stopped in the lobby to talk to the officer, impeded the flow of traffic, and refused to move. Parr testifies that Sergeant Green then gave Parr the order to place Washpon under arrest based on her failure to comply with the order to leave the building.[10]

Sergeant Green's version of events is that as Washpon was walking away from the metal detector, he saw her approach another officer (presumably the officer at the podium) and "proceeded to speak in a loud manner, using profanity."[11] After witnessing this exchange, and based upon her failure to leave the building, Sergeant Green gave the order to place her under arrest.[12]

Washpon disputes that there was anyone else present in the courthouse lobby while these events occurred,[13] and although admits that she was "frustrated,"[14] she avers that she never used any profanity.

The parties also provide slightly different versions of how the arrest itself was executed. According to Washpon, three officers—Parr, Lancer and Green—pushed her up against a banister, twisted her arm, and handcuffed her.[15] As they were placing the handcuffs on her, they were "nipping" pieces of skin off of her hands.[16] Washpon maintains that she told the officers repeatedly that they were hurting her, but they did not listen.

Neither Officer Parr nor Sergeant Green has any recollection of Washpon complaining about the handcuffs, or any other conditions.[17]

After Washpon was arrested, Officers Parr and Lancer took her to an office, where she remained in handcuffs for what she claims was around 45 minutes.[18] Washpon again recalls complaining to the officers that the handcuffs were too tight and were hurting her, but to no avail.[19] Again, the officers have no recollection of her complaining about the tightness of the handcuffs.

Washpon's bag was searched, and the officers ran a warrant check.[20] Washpon claims that the officers improperly confiscated her shield and ID from when she had been an auxiliary police officer in the mid–1990s.[21] Washpon also claims that, initially, Officer Parr intended to let her go without a summons, but when Sergeant Green heard as much, he said, "No, I'm not having that," and directed Officer Parr to write up a summons.[22] Eventually,

---

9. Washpon Dep. 40:14–42:23.

10. Parr Decl. ¶¶ 6–8.

11. Green Decl. ¶ 19.

12. Green Decl. ¶ 20.

13. Washpon Dep. 25:9–14; 39:7–15.

14. Washpon Dep. 43:13–14.

15. Washpon Dep. 49:8–13.

16. Washpon Dep. 50:8–23.

17. Green Decl. ¶ 23;

18. Washpon Dep. 52:1–24.

19. Washpon Dep. 52:2–17.

20. Parr Decl. ¶¶ 9, 12; Washpon Dep. 54:5–16.

21. Washpon Dep. 56:16–60:16.

22. Washpon Dep. 56:10–20.

Washpon was issued a summons for disorderly conduct, and released from custody.[23]

Washpon claims that after the handcuffs were removed, her hands were aching and swollen; the handcuffs had taken off some small pieces of skin on both of her hands; the back and side of both hands suffered general scratches and "abrasions;"[24] there was "the first little blood";[25] and she could not remove her rings or other jewelry due to the swelling. (Washpon apparently took photographs of her hands immediately after the incident, but she maintains they came out blurry, and in any event she can no longer find the photographs.[26])

Upon leaving the courthouse, Washpon went to the emergency room at Mount Sinai hospital, where she was given a tetanus shot, and her hands were treated with iodine.[27] She was told to soak her hands and compress them to remove the swelling, and then released. A week later, Washpon went for a follow-up visit with her regular doctor, who informed her that there was no infection.[28]

Washpon maintains that she suffered permanent injury in the form of three "marks" or "scars" where the handcuffs ripped pieces of skin off her hands.[29]

## II. Legal Proceedings

On September 9, 2004, Washpon appeared before Judicial Hearing Officer (JHO) Harold Enten of the Bronx Criminal Court on the disorderly conduct charge. After hearing testimony from Officer Parr and from Washpon, JHO Enten found Washpon guilty of disorderly conduct and ordered her to pay $145 in fines and surcharges.[30]

Plaintiff filed this lawsuit in March of 2006, against defendants in their individual and official capacities. In August, 2006, defendants moved to dismiss the amended complaint based on: (1) qualified immunity; (2) the Eleventh Amendment bar on plaintiff's claims against the officers in their official capacities; and (3) the doctrine of *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Before the defendants' motion was fully briefed, however, the New York Appellate Division, First Department reversed Washpon's conviction on the grounds that she had not consented to trial before a judicial hearing officer. *People v. Washpon*, 13 Misc.3d 130(A), 824 N.Y.S.2d 757 (1st Dep't.2006).[31] The Appellate Division, First Department also dismissed the charging instrument, finding that "no penological purpose" would be served by further proceedings. *Id.*

---

**23.** Parr Decl. ¶ 13; Ex. A [Summons issued to Kimasia Washpon, dated March 31, 2004].

**24.** Washpon Dep. 70:10–11.

**25.** Washpon Dep. 70:4–7. Washpon states: "When you get scratched and you pull the first layer of skin, you get that layer of blood. I had that on my hands and on my wrists." *Id.*

**26.** Washpon Dep. 77:20–25.

**27.** Washpon Dep. 73:21–25. *See* Medical Report dated March 31, 2004, annexed to Martin Decl. as Ex. E.

**28.** Washpon Dep. 76:15–19.

**29.** Washpon Dep. 70:24–71:22.

**30.** A transcript of the proceedings is attached as Exhibit B to the Declaration of Roberta Martin in Support of Defendant's Motion for Summary Judgment.

**31.** A copy of the decision was attached as Exhibit A to plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, dated October 16, 2006.

Accordingly, in light of this development, defendants withdrew their arguments based on *Heck v. Humphrey*, and asked this Court to consider only their Eleventh Amendment defense.[32] On February 16, 2007, this Court granted defendants' motion to dismiss the claims against all three officers in their official capacities, on Eleventh Amendment grounds.

Following additional discovery, the instant motion for summary judgment ensued.

## DISCUSSION

### I. Legal Standard

A motion for summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the evidence submitted must be viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While credibility determinations, weighing evidence and drawing legitimate inferences from facts are functions that the Court must leave to the jury, if the nonmoving party does not present evidence from which a reasonable jury could return a favorable verdict, then summary judgment is appropriate. *See, e.g., Golden Pacific Bancorp. v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir.2004).

### II. Washpon's Claims

Although Washpon's complaint sets forth only three numbered causes of action, we construe the complaint as actually raising six separate claims. *See* Fed. R.Civ.P. 15(b); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 568–69 (2d Cir.2000).

In what follows, we consider each claim *in seriatim*.

### A. False Arrest

Washpon's first cause of action is for false arrest. In the context of § 1983 false arrest claims, federal courts look to the law of the state in which the arrest occurred. *See, e.g., Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir.2004) (gathering cases). Under New York law, "a plaintiff claiming false arrest must show, inter alia, that the defendant intentionally confined him without his consent and without justification." *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir.1999) (*quoting Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996)).

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Id.* (quoting *Weyant*). Probable cause exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir.1995).

Courts may determine whether or not probable cause existed, as a matter of law, if there is no disagreement as to the pertinent events and the knowledge of the officers. *Weyant*, 101 F.3d at 852. A finding of probable cause is made based on the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Here, we cannot conclude as a matter of law that probable cause existed for the officers to arrest Washpon for disorderly conduct. Accepting the facts in the light most favorable to the non-moving party, Washpon, the elements of disorderly conduct under New York law were not met.

---

**32.** Defendant's Reply Memorandum of Law in Further Support of Motion to Dismiss, at 2.

Crucially, under Washpon's version of events, no one else was present in the Courthouse lobby when she was arrested. Under New York law:

A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:

1) He engages in fighting or in violent, tumultuous or threatening behavior; or

2) He makes unreasonable noise; or

3) In a public place, he uses abusive or obscene language, or makes an obscene gesture; or

4) Without lawful authority, he disturbs any lawful assembly or meeting of persons; or

5) He obstructs vehicular or pedestrian traffic; or

6) He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or

7) He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.

New York Penal Law § 240.20. While under the officers' version of events Washpon violated a number of these provisions, under her version of the facts it is open to dispute whether she in fact violated any of them. If we accept Washpon's allegations that no one else was present, then Washpon did not impede any pedestrian traffic. Washpon also disputes whether she used obscene or abusive language. *See Posr*, 180 F.3d at 415.

However, even if there was no probable cause to arrest, a police officer may nonetheless be immune from a claim of false arrest under the doctrine of qualified immunity if "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991); *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 128 (2d Cir.1997); *Posr* 180 F.3d at 416.[33] Thus, even if an officer is mistaken, and the arrestee did not commit the crime, the officer will not be held liable if he acted reasonably and in good faith. *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).[34]

Here, at a minimum, it is clear that reasonably competent police officers could disagree as to whether there was probable cause to arrest. Even under Washpon's own version of events at least twice she disobeyed orders from Officer Parr to vacate the building—once to talk to the officer at the podium, and a second time to "rearrange" her belongings at the top of the first flight of stairs. Also, even if the officers had mistakenly believed that Washpon used profanity or that there were other people in the courthouse lobby, (and as a matter of common sense people come in and out of courthouse lobbies all the time) then qualified immunity would protect the officers as long as their belief was reasonable. *See Moore v. Vega*, 371 F.3d 110, 117 (2d Cir.2004) ("a mistake

---

**33.** The test is the same under state law. *See Baez v. City of Amsterdam*, 245 A.D.2d 705, 706–707, 666 N.Y.S.2d 312, 313 (3d Dep't. 1997).

**34.** The determination of whether police officers are entitled to qualified immunity is to be determined independent of the merits of the underlying action. *Washington Square Post*

*# 1212 v. Maduro*, 907 F.2d 1288, 1293 (2d Cir.1990). "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

while engaging in the performance of an official duty ... does not deprive a government officer of immunity").

The conclusion that "reasonably competent" police officers might have believed there was probable cause to make the arrest for disorderly conduct is buttressed in this case by the fact that a JHO found Washpon guilty of disorderly conduct beyond a reasonable doubt. Even though Washpon's conviction was reversed on non-merits procedural grounds, and therefore may not be direct evidence of the existence of probable cause to make the arrest, *see Weyant*, 101 F.3d at 854, the fact that an experienced jurist found Washpon guilty beyond a reasonable doubt may still factor into our analysis, under the qualified immunity standard, of what was "objectively reasonable" for law enforcement officers on the scene to have believed. In the New York State system, JHOs are retired judges who wish to continue working past the mandatory retirement age,[35] and the fact that such a magistrate found Washpon guilty shows at least that reasonably competent officers could reasonably have disagreed on the propriety of the arrest.

Accordingly, we hold that the defendants are entitled to summary judgment on plaintiff's false arrest claim on the ground of qualified immunity.

### B. Illegal Search

Plaintiff's second claim is for the allegedly "illegal search" of her belongings that occurred subsequent to her arrest.[36]

■■■ In the context of a § 1983 damages action asserting an illegal search, "[t]he relevant question ... is ... whether a reasonable officer could have believed [the] search to be lawful, in light of clearly established law and the information the searching officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see also Castro v. United States*, 34 F.3d 106, 112 (2d Cir.1994) ("Officials are entitled to qualified immunity when their decision was reasonable, even if mistaken." (emphasis in original)); *accord Butz v. Economou*, 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (stating that federal officials are shielded by qualified immunity from mere mistakes in judgment regardless of whether the mistake is one of fact or law).

■■■ Here, even under Washpon's version of events, the search was incident to her arrest, and limited to her person and her handbag.[37] Since we found above that the defendants were entitled to qualified immunity on Washpon's false arrest claims, it follows that a routine, non-invasive search of her personal belongings that is incident to that arrest is shielded by qualified immunity as well.

35. The New York Constitution, Article VI, § 25(b) requires that: "Each ... judge of the district court shall retire on the last day of December in the year in which he or she reaches the age of seventy." After that, judges are able to apply to become judicial hearing officers pursuant to Article 22 of the Judiciary Law. *See Levine v. McCabe*, 357 F.Supp.2d 608, 611–612 (E.D.N.Y.2005).

36. The search and seizure language of the Fourth Amendment of the United States Constitution and the language of Article 1, Section 12 of the New York State Constitution is identical, and the two provisions generally confer similar rights. *People v. Harris*, 77 N.Y.2d 434, 437, 568 N.Y.S.2d 702, 570 N.E.2d 1051 (N.Y.1991).

37. While law enforcement officials typically must obtain a search warrant based on probable cause before conducting any type of search, there is a well-established exception for searches conducted pursuant to a lawful arrest. *See United States v. Robinson*, 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (a search incident to a lawful arrest may include both a search of the person arrested and a search of the area within the control of that person).

Accordingly, we hold that the defendants are entitled to summary judgment on Washpon's illegal search claims.

## C. Malicious Prosecution

■■■■■ Plaintiff's third claim is for malicious prosecution. "To sustain a § 1983 claim of malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty." *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003) (*citing Singer v. Fulton County Sheriff,* 63 F.3d 110, 116–17 (2d Cir.1995)). Specifically, under New York law, the following elements must be satisfied: "(1) the defendant commenced or continued a criminal proceeding against plaintiff, (2) the proceeding terminated in plaintiff's favor, (3) there was no probable cause for the criminal proceeding, and (4) the defendant initiated the criminal proceeding out of malice." *Bernard v. United States,* 25 F.3d 98, 104 (2d Cir.1994). As the Second Circuit has noted, "Because accusers must be allowed room for benign misjudgments, the New York Court of Appeals has held that the law places a heavy burden on malicious prosecution plaintiffs." *Rothstein v. Carriere,* 373 F.3d 275, 282 (2d Cir.2004) (internal quotations omitted).

■■■■■ Here, the defendants are entitled to summary judgment on their qualified immunity defense because no reasonable jury could conclude that the defendants' actions in initiating criminal proceedings against Washpon were objectively unreasonable in light of clearly established law. As discussed above, if reasonably competent officers could dis-

agree as to the propriety of making an arrest, so too they could disagree about initiating criminal proceedings. We note that in the context of malicious prosecution claims, "probable cause" to believe that a prosecution could succeed has been described as "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Colon v. City of New York,* 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (N.Y.1983). A presumption of probable cause may be created by a grand jury's indictment. *Colon,* 60 N.Y.2d at 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248; *see also McClellan v. Smith,* 439 F.3d 137, 145 (2d Cir.2006).[38] Reasoning by analogy, the fact that Washpon was convicted of disorderly conduct beyond a reasonable doubt by a judicial hearing officer, even though that conviction was later reversed on non-merits procedural grounds, tends to shows that a reasonably prudent person could believe that Washpon was guilty.

■■■■■ Further, we note that plaintiff may not be able to meet her burden of showing the required element that criminal proceedings "terminated in the plaintiff's favor." Although Washpon's conviction was ultimately reversed by the Appellate Division, the reversal was not on the merits. In the context of malicious prosecution claims, New York law does not necessarily treat non-merits reversals as "terminat[ions] in the plaintiff's favor." *See, e.g., Halberstadt v. New York Life Ins. Co.,* 194 N.Y. 1, 86 N.E. 801 (N.Y.1909); *Rothstein,* 373 F.3d at 286–288. For example, in *Ward*

---

**38.** The presumption is rebuttable, and may be overcome by evidence establishing that the police witnesses "have not made a complete and full statement of facts . . . that they have misrepresented or falsified evidence . . . or otherwise acted in bad faith." *Colon,* 60 N.Y.2d at 82–83, 468 N.Y.S.2d 453, 455

N.E.2d 1248. "If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* at 83, 468 N.Y.S.2d 453, 455 N.E.2d 1248.

*v. Silverberg,* 85 N.Y.2d 993, 994, 629 N.Y.S.2d 168, 652 N.E.2d 914 (N.Y. 1995), the New York Court of Appeals held that a dismissal of a criminal prosecution "in the interest of justice" did not constitute a favorable termination. In that case, criminal charges against the plaintiff had been dropped, apparently because the debt she owed was only $25. When she later sued her creditor for malicious prosecution, the Court of Appeals held that there had been no favorable termination of the criminal charges "because the question of guilt or innocence remained unanswered." *Id.* Here, the accusatory instrument against Washpon was dismissed because proceedings would not "serve any useful penological purpose." For support, the Appellate Division cited to *People v. Burwell,* 53 N.Y.2d 849, 440 N.Y.S.2d 177, 422 N.E.2d 822 (N.Y. 1981), a criminal case dismissed because defendant has already served her sentence and the charges against her involved relatively minor crimes. While we need not decide the issue here, it may very well be that the dismissal of the accusatory instrument in Washpon's case is similar to the one in *Ward,* and therefore not a "termination in plaintiff's favor" as required to sustain a claim of malicious prosecution.

Thus, defendants are entitled to summary judgment on the malicious prosecution claim.

### D. Excessive Force

Plaintiff's next claim is for excessive force. The Supreme Court has held that "claims that law enforcement officers have used excessive force ... in the course of

an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).[39]

In this context, we first ask whether the facts, taken in the light most favorable to the plaintiff, show that the use of force was not objectively reasonable. *Cowan v. Breen,* 352 F.3d 756, 761 (2d Cir.2003) (*citing Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272, (2001)). If it was not reasonable, then for purposes of determining qualified immunity we next ask the purely legal question of whether the law was sufficiently established that a reasonable officer would know his conduct was unlawful. *Id.*

To determine whether the amount of force used is reasonable, a reviewing court must take into consideration the "totality of the circumstances faced by the officer on the scene," *Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995), and assess whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Graham,* 490 U.S. at 397, 109 S.Ct. 1865.

Additionally, on an excessive force claim a plaintiff must present sufficient evidence to establish that "the alleged use of force is 'objectively sufficiently serious or harmful enough' to be actionable." *Cunningham v. Rodriguez,* 2002 WL 31654960, at *4 (S.D.N.Y.2002) (*quoting United States v. Walsh,* 194 F.3d

---

**39.** The same standard is used to evaluate claims of assault and battery under New York law. *Posr v. Doherty,* 944 F.2d 91, 94–95 (2d Cir.1991). *See also Rivera v. City of New York,* 40 A.D.3d 334, 341, 836 N.Y.S.2d 108, 115 (1st Dep't.2007) ("In order to determine whether a police officer used excessive force, the claim must be analyzed under the Fourth Amendment and its standard of objective reasonableness.") (*citing Ostrander v. State of New York,* 289 A.D.2d 463, 464, 735 N.Y.S.2d 163 (2001)).

37, 47 (2d Cir.1999)). "A de minimis use of force will rarely suffice to state a Constitutional claim," *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). "(D)e minimis injury can serve as conclusive evidence that de minimis force was used." *Carr v. Deeds,* 453 F.3d 593, 606 (4th Cir.2006) (citation omitted).[40]

Suspects, of course, are routinely handcuffed, and to be effective handcuffs must be tightly secured. *Esmont v. City of New York,* 371 F.Supp.2d 202, 214 (E.D.N.Y.2005). *See also Scott v. County of Nassau,* No. 94 CV 4291, 1998 WL 874840, 1998 U.S. Dist. LEXIS 19680 (E.D.N.Y.1998) (merely handcuffing a suspect and requiring her to place her hands behind her back is not a constitutional violation). A line of cases holds that minor injuries that result from tight handcuffs, such as temporary swelling, inflammation or soreness of an arrestee's wrists, are insufficient on their own to sustain a Fourth Amendment excessive force claim. *See Drummond v. Castro,* 522 F.Supp.2d 667, 679 (S.D.N.Y.2007) (claim that handcuffs are too tight, in the absence of any other injury, fails to violate Fourth Amendment); *Hamlett v. Town of Greenburgh et al.,* No. 05 CV. 3215(MDF), 2007 WL 119291 at *3 (S.D.N.Y. Jan. 17, 2003) (allegations of brief numbness from tight handcuffs do not rise to the level necessary to sustain a claim of excessive force); *Wilder v. Village of Amityville et al.,* 288 F.Supp.2d 341, 344 (E.D.N.Y.2003) (tight handcuffs that resulted in brief period of inflammation and soreness does not rise to level of objective excess use of force).

▇▇▇ On the other hand, use of restraints in such a way as to cause permanent injury or scarring may support an excessive force claim. In *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994), the Second Circuit reversed a district court's determination that the use of tight mechanical restraints was de minimis because the plaintiff, an inmate being transferred from one prison to another, stated in his complaint that the restraints were "so tight as to cut into my flesh and reduce circulation and cause swelling. My right ankle now has a scar and numbness in the area. My wrists were numb for several months afterwards. The tight chain also hurt my spine, as the chain and padlock pressed into it." The Second Circuit held that such an allegation, if true, would not be a de minimis use of force: "The alleged use of force in this case—resulting in permanent scarring and 'numbness'—is clearly more than de minimis." *Davidson,* 32 F.3d at 30. *See also Simpson v. Saroff,* 741 F.Supp. 1073, 1078 (S.D.N.Y.1990) (allegations of punched stomach, swollen and bleeding wrists, and "faintly detectable scar" were sufficient to support a § 1983 claim).

▇▇▇ Here, viewing the facts in the light most favorable to the plaintiff, we cannot say as a matter of law that the alleged injuries are *de minimis.* Although many of Washpon's complaints relate to temporary pain from swelling and discomfort, Washpon did seek emergency medical treatment right after the incident, and she does allege that the handcuffs caused permanent scarring. The fact that the scars still exist some three or four years after the incident in question distinguishes her case—albeit just barely—from those where handcuffs caused only temporary pain or swelling.

▇▇▇ Nor can we conclude on this record that the officers are entitled to qualified immunity with respect to this claim. Since the law in this area is well-estab-

---

**40.** As the Supreme Court put it, "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865.

lished, "in Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir.2003) (internal quotation omitted). That is, a defendant is entitled to qualified immunity only if his actions were "objective[ly] reasonable." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Since we cannot say as a matter of law that their actions were reasonable, they are not entitled to qualified immunity.

Accordingly, defendants' motion for summary judgment on Washpon's excessive force claim is denied.[41]

### E. First Amendment Claim

Washpon's fifth claim asserts that the officers' suppressed her free speech, in retaliation for her having spoken out against them.[42]

It is well-established that to recover on a First Amendment claim under § 1983, "a plaintiff must demonstrate that his conduct is deserving of First Amendment protection and that the defendants' conduct of harassment was motivated by or substantially caused by his exercise of free speech." *Rattner v. Netburn*, 930 F.2d 204, 208 (2d Cir.1991) (*citing Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir.1987); *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 418 (2d Cir.1999)).[43]

 Plaintiff's free speech claim is meritless. While we doubt plaintiff can sustain a claim under either prong, we focus on the first prong, whether her speech was constitutionally protected. In determining whether the First Amendment protects particular speech on government property, we must first examine the nature of the forum in which the speech was restricted. The Supreme Court has classified government-owed property into three categories—the traditional public forum, the public forum created by government designation, and the nonpublic forum. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Supreme Court and Second Circuit precedent are clear that a courthouse is a nonpublic forum. *Huminski v. Corsones*, 396 F.3d 53, 90–91 (2d Cir.2005) ("The function of a courthouse and its courtrooms is principally to facilitate the smooth operation of a government's judicial functions.... These purposes are likely to be incompatible with expressive activities inside a courthouse.") *See also United States v. Grace*, 461 U.S. 171, 178, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (holding that the Supreme Court building and its grounds other than public sidewalks are not public forums, and noting "[Courts have] not been traditionally held open for the use of the public for expressive activities.").

 Inside a non-public forum, governmental restrictions on expressive conduct or speech are constitutional so long as they are reasonable in light of the use to which the forum is dedicated and "are not an effort to suppress expression merely be-

**41.** We note, however, that a denial of summary judgment solely indicates that an issue of fact has been raised. As the case proceeds, not only must the issue of fact be resolved, but, even if resolved in the plaintiff's favor, the issue of damages remains. The size of any scars, which from the record appear to be small, will be relevant to any potential calculation of damages.

**42.** Compl. ¶ 23.

**43.** We note that "[w]hile the New York Constitution generally affords greater protection than the federal constitution with regard to speech, claims of free speech retaliation under the New York State Constitution are governed by the same principles that apply under the Federal Constitution." *Burns v. Cook*, 458 F.Supp.2d 29, 38 (N.D.N.Y.2006).

cause public officials oppose the speaker's view." *Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439 (citation, internal quotation marks, and alterations omitted). Reasonableness "must be assessed in light of the purpose of the forum and all the surrounding circumstances." *Id.* at 809, 105 S.Ct. 3439. *See also Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

Here, any restrictions on Washpon's speech were reasonable in light of her admitted failure to pass through security or to comply with the officers' directives to vacate the building. Further, Washpon offers no reason to believe that government regulation amounted viewpoint discrimination. Thus, plaintiff's First Amendment claim is dismissed.

**F. Equal Protection**

■ Plaintiff's equal protection claim is frivolous. To state a claim for a violation of her right to equal protection, plaintiff must allege that, (1) "compared with others similarly situated, plaintiff was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir.2004) (*quoting Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir.1999)). "A plaintiff generally must satisfy both elements to establish a claim of selective enforcement." *LaTrieste Restaurant v. Village of Port Chester*, 188 F.3d 65, 70 (2d Cir.1999) (*citing Zahra v. Town of Southold*, 48 F.3d 674, 684 (2d Cir.1995)).[44]

■ Plaintiff has failed to raise any triable issue with respect to this claim.

She has not sufficiently alleged that she was treated differently, let alone that such treatment was the product of impermissible considerations. Accordingly, plaintiff's equal protection claim is dismissed.

**III. Washpon's State Law Claims**

Washpon brings a number of claims identical to her federal claims under Article I § 11 the New York State Constitution. In *Brown v. State of New York*, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (1996), the New York State Court of Appeals recognized the availability of damages causes of action against the state for equal protection and search and seizure violations of Article I, §§ 11 and 12 of the New York State Constitution. 89 N.Y.2d at 192, 652 N.Y.S.2d 223, 674 N.E.2d 1129. However, *Brown's* application has been limited by both district and state courts to situations where the plaintiffs have no alternative remedies that would protect their interests. *See e.g., Coakley v. Jaffe*, 49 F.Supp.2d 615, 628–29 (S.D.N.Y.1999) (holding that plaintiff has no right of action under the New York State Constitution because "any violation of plaintiff's right to be free from unreasonable searches or seizures can be vindicated through" plaintiff's viable Fourth Amendment claim), *affirmed by*, 234 F.3d 1261 (2d Cir.2000); *see also Bath Petroleum Storage, Inc. v. Sovas*, 136 F.Supp.2d 52, 58 (N.D.N.Y.2001) (holding that *Brown* was inapplicable and declining to find a private right of action under the due process clause of the New York State Constitution because "[h]ere, unlike Brown, Plaintiffs have stated a viable § 1983 claim against defendants.")

■ In this case, plaintiff has viable federal equal protection, free speech, false arrest and excessive force claims against

**44.** "The breadth of coverage under the equal protection clauses of the federal and state constitutions is equal." *Pinnacle Nursing*

*Home v. Axelrod*, 928 F.2d 1306, 1317 (2d Cir.1991).

the officer defendants. The exception provided by *Brown* therefore does not apply to plaintiff's state constitution claims against the officers. Accordingly, plaintiff's Article I, § 11 claims against the officer defendants are dismissed.

## IV. Personal Involvement of Officer Lancer

Finally, defendants also move to dismiss Officer Lancer from the case, on the grounds that there is no allegation of her personal involvement, and it is well-established that the "personal involvement of defendant in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) (*citing McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). However, the complaint clearly names Officer Lancer as a defendant, and alleges that "defendants" handcuffed Washpon. At her deposition, Washpon averred that all three defendants—including Officer Lancer—were involved in the arrest. Accordingly, at this stage, it would be inappropriate to dismiss Officer Lancer.

### *CONCLUSION*

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. All claims are dismissed except for plaintiff's excessive force claim. Unless the case has otherwise settled before then, the parties are directed to appear for a conference in Courtroom 21A of 500 Pearl St. on Wednesday, July 2, 2008 at 3:30 p.m.

**IT IS SO ORDERED.**